UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 24-cr-203 (RBW) |
| ALLAN JENNINGS, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Allan Jennings to 15 months of incarceration (the midpoint of the applicable guidelines range), 3 years of supervised release, $2,825 in restitution (as agreed-to as part of Jennings' plea), and a $100 special assessment.

I.      INTRODUCTION

The defendant, Allan Jennings, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Jennings was one of the very first rioters to enter the Lower West Terrace "Tunnel." Upon entering the Tunnel with the mob behind him, Jennings used a pair of medical scissors to shatter a locked glass door separating the rioters from an already-battered group of U.S. Capitol Police and Metropolitan Police Department Officers. This act was the catalyst that set off hours of perhaps the most intense violence committed against law enforcement at the Capitol that day, because breaking this door allowed the mob of rioters around and behind Jennings to surge forward and begin a protracted assault on the police. Jennings took it upon himself to break through one of the police's final lines of defense in the Tunnel, which ensured that the conflict between rioters and police that began outside on the Capitol's West Plaza would continue inside the Tunnel. Jennings also lent his physical strength to the rioters' initial pushes against the police in the Tunnel.

The government recommends that the Court sentence Jennings to 15 months of incarceration for his conviction of violating 18 U.S.C. §§ 231(a)(3) and 1361. Such a sentence reflects the gravity of Jennings' conduct while acknowledging his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 31, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Jennings' Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Jennings and his wife travelled together from their home in Hillsboro, Tennessee, to Washington, D.C., to attend former President Trump's "Stop the Steal" rally on January 6, 2021. That day, Jennings wore a red "TRUMP" hat, a dark jacket, a sweatshirt with a light gray hood, and dark glasses. Image 1.



**Image 1 (Jennings circled)**

He also carried a backpack, which contained, among other things, a pair of emergency medical/trauma scissors that were equipped with a point on the handle designed to shatter glass. *See* Image 2 (depicting trauma shears seized during the execution of a search warrant at Jennings' residence).



**Image 2 (glass-breaking end circled)**

3

After attending the rally, Jennings joined the crowd moving to the Capitol. He arrived on the Capitol's west side, and he moved up the West Front onto the plaza in front of the Inaugural Stage. By approximately 2:40 p.m., the violent mob Jennings joined on the plaza had successfully broken through police and pursued retreating officers up onto the inaugural stage. Officers fell back into the Tunnel and the mob followed.

At approximately 2:41 p.m., Jennings entered the Tunnel. Image 3; *see also* Exhibit 1[2] (Capitol CCV).



**Image 3 (Jennings circled)**

Jennings was the second rioter to enter the Tunnel. After passing under the Tunnel's entrance archway, Jennings ran forward—ahead of the other initial entrants from the mob—and approached the first set of Tunnel doors, which police were able to lock just moments before.

---

[2] Video exhibits referenced in this memorandum will be provided separately to the Court and defense counsel.

Holding his phone as if recording video, Jennings shouted and pointed through the glass at the regrouping officers as rioters poured into the Tunnel to join Jennings. Image 4; *see also* Exhibit 2 (MPD BWC depicting the Tunnel from approximately 2:40 p.m. to 2:44 p.m.).



**Image 4 (Jennings circled)**

Rioters began to pound on the doors but were unable to open them. Exhibit 2. Then, at approximately 2:42 p.m., Jennings drew his emergency medical scissors from his pocket, showed them to a nearby rioter and felt the scissors' glass-breaking tip with his hand. *Id.* MPD officers peering through the second set of doors noticed Jennings draw the scissors, and, as Jennings began to raise the scissors above his head, one officer shouted, "He's got a weapon in his hand!" *Id.* (timestamp 14:42:00); *see also* Image 5.



**Image 5 (Jennings circled)**

Jennings tapped the glass-breaking end on the door before pulling back the shears and started striking the glass. The glass quickly shattered on Jennings' second attempt. Image 6; *see also* Exhibit 2. It cost the Architect of the Capitol $825 to repair the door. *See* ECF No. 30 ¶ 11.



**Image 6 (Jennings circled)**

After the glass door shattered, rioters were able to open and move through this first set of doors, then the second set of unsecured doors, and engaged the police line. Jennings, holding the broken door open for rioters to accost the police line, then appeared to notice that his hand was bleeding. Image 7.



**Image 7 (Jennings in yellow box)**

Despite his injury, Jennings pushed through the crowd to the front of the mob, which had begun assaulting the police line. He put his hands up to an officer's riot shield and continued pointing and shouting at officers. Image 8.



**Image 8 (Jennings circled)**

Shortly thereafter, Jennings—despite his still-bleeding hand—braced himself against the broken doorframe and shoved his body backward to support the rioters' collective pushing against the police line. Image 9; *see also* Exhibit 3 (open-source video depicting rioters' view in the Tunnel).



**Image 9 (Jennings and his hand against the door frame circled)**

At approximately 2:47 p.m., Jennings exited the Tunnel. As he left with his hand still bleeding, rioters at the Tunnel entrance patted Jennings on the back. Image 10. In the meantime, the violence in the Tunnel continued and did not cease for several hours. Exhibit 4 (BWC video depicting Tunnel violence between rioters and officers approximately 2:56 p.m. and 3:01 p.m.); Exhibit 5 (video: Commander Ramey Impact Statement).



**Image 10 (Jennings circled)**

***Jennings' Two Interviews with Law Enforcement***

The FBI first interviewed Jennings on January 11, 2022, prior to his arrest. Jennings admitted to going to the Capitol after the rally on January 6 and stated he and his wife never discussed going into the building or undertaking any action to stop the certification of the election. Jennings reported that his wife stayed on the West Front while he walked up the stairs under the scaffolding towards the inaugural stage. Jennings claimed he did not observe any signs indicating

the area was closed nor police officers in the Tunnel's archway—only other members of the crowd in front of him. He also claimed that he did not enter the Capitol at any point and denied having contact with any police officers or damaging any property. Jennings identified himself in photos from the Capitol's exterior that day.

Following his arrest, Jennings agreed to be interviewed again by the FBI. Jennings stated that he carried a medical bag containing trauma scissors with him on January 6, 2021, in case something were to happen. Upon being confronted with video of his acts in the Tunnel, Jennings admitted to shattering the Tunnel door's glass and cutting his hand on the broken glass. When asked why he was trying to get in the building, Jennings stated that he got caught up in "mob mentality" and attributed his conduct to "stupidity."

## III.   THE CHARGES AND PLEA AGREEMENT

On April 25, 2024, a two-count information was filed charging Jennings with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and Destruction of Government Property (misdemeanor), in violation of 18 U.S.C. § 1361. On, June 21, 2024, Jennings was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.   STATUTORY PENALTIES

Jennings now faces sentencing on 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1361.

As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office, as to Count One of the Information, Jennings faces maximums of 5 years of imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 special assessment. As to Count Two, Jennings faces maximums of 1 year of imprisonment, a $100,000 fine, 1 year of supervised release, and a $25 special assessment.

## V.       THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR's guidelines calculation contains an error. As noted in the plea agreement, ECF No. 30 at 3, with respect to Count Two, the government maintains that the offense level should be 14 pursuant to U.S.S.G. §2B1.1(b)(16)(A).[3] Over the government's objection to the draft PSR, ECF No. 38, Probation concluded that this Specific Offense Characteristic did not apply, and the offense level for Count Two is 6. PSR ¶ 49.

Pursuant to §2B1.1(b)(16)(A), a specific offense characteristic applies to a defendant's conviction for destruction of property "[i]f the offense involved [ ] the conscious or reckless risk of death or serious bodily injury[.]" When this specific offense characteristic is applicable, a 2-level increase applies unless the resulting offense level is less than 14, then the offense level is increased to 14.

"[A] defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person." *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011). Actual injury need not have even occurred for such an enhancement to apply, only an increased "risk." *See, e.g.*, *United States v. Manamela*, 463 F. App'x 127, 134, n.6 (3rd Cir. 2012) (enhancement applicable in fraud case involving failure

---

[3] As part of the plea agreement, Jennings reserved the right to oppose this Specific Offense Characteristic.

to supervised children under city contract, but no evidence children were harmed); *Maestas*, 642 F.3d at 1320-21 (finding applicability where defendant was "conscious of or reckless as to the existence of the risk created by his or her conduct"). So long as a defendant's act involves raising the level of risk, the specific offense characteristic applies. *See, e.g.*, *United States v. Thorsted*, 493 F. App'x 580, 582 (9th Cir. 2011) (where defendant made numerous false distress calls to the Coast Guard, enhancement was applicable due to its effect on risks inherent to air/sea rescue efforts); *United States v. Awad*, 551 F.3d 930, 941 (9th Cir. 2009) (in Medicare fraud case, enhancement applicable where risks were increased because patients received care from medical professionals without a doctor's supervision); *United States. v. Babul*, 476 F.3d 498, 503 (7th Cir. 2007) (enhancement applicable where defendant fraudulently awarded truck licenses to unlicensed persons); *United States v. Ebersole*, 411 F.3d 517, 536, n.19 (4th Cir. 2005) (enhancement applicable where defendants did not properly train dogs for law enforcement use); *United States v. West Coast Alum. Heat Treating*, 26 F.3d 986, 992 (9th Cir. 2001) (false statements regarding compliance with contract specifications for aircraft parts justified a risk of serious bodily injury enhancement); *United States v. Trusty*, 68 F. App'x 801, 803 (9th Cir. 2003) (reckless risk of death or serious bodily injury found where defendant damaged an aircraft's back-up systems).

When he shattered the glass on a door blocking the rioters' access to the Capitol via the Tunnel, Jennings was "conscious of or reckless as to the existence of the risk created by his [ ] conduct." *Maestas*, 642 F.3d at 1320-21. Jennings did not break the glass by accident—it was deliberate and aligned with the mob's goal of breaching the Capitol building. And Jennings broke the door regardless of how many police would be assaulted in the battle that followed.

Moreover, Jennings, like many if not all of the other rioters to join the first wave in the Tunnel, came to the Tunnel from the West Front and the plaza in front of the inaugural stage. There, Jennings would have seen innumerable assaults on law enforcement, including the violence that occurred when the mob successfully broke the West Front police line at approximately 2:29 p.m. Once the police line on the West Front fell and Jennings joined rioters moving up the scaffolding steps to pursue officers attempting to find a respite inside the Tunnel, Jennings knew what further contact between the police and rioters would create: a reignition of the chaos, violence, and the reasonably apparent potential for serious bodily injury or death.

Knowing or disregarding this obvious risk, Jennings nevertheless used the glass-breaking end of his medical scissors to destroy the locked Tunnel door, which physically separated himself and other rioters from the police on the other side. The violence in the Tunnel that followed as rioters rushed forward, and which Jennings briefly joined, was not just readily foreseeable, it was the mob's goal from the beginning. And that risk did not just extend to the officers—it applied to *everyone* in the Tunnel. Exhibit 4; Exhibit 5.

Probation concluded that the enhancement does not apply to Jennings' conduct because his acts "did not directly cause 'serious bodily injury' to any officers." PSR at 26. This conclusion is flawed for two reasons. First, as noted above, actual injury need not have occurred for the enhancement to apply. Nevertheless, the battle in the Tunnel that ensued when rioters flooded into the Tunnel through the door that Jennings destroyed caused multiple officers to sustain injuries. Second, the enhancement does not require "direct" cause of injury—the conduct need only "involve" the risk of injury. In *Trusty*, the defendant appealed his "15-month sentence imposed following his guilty plea conviction for willful damage to civil aircraft, in violation of 18 U.S.C.

§ 32(a)(1)." 68 F. App'x at 802. Relevant here, the Ninth Circuit determined that the district court properly applied the 2B1.1(b) risk of serious bodily injury or death enhancement because that defendant "caused damage to [ ] aircrafts' back up systems, increasing the likelihood of a catastrophe." *Id.* at 802–03. Jennings, likewise, destroyed property such that an obvious "likelihood of a catastrophe" increased: he was the rioter that broke the dam that held back the flood of rioters back. *See id.* (citing *West Coast Alum. Heat Treating*, 26 F.3d at 992; *United States v. Johansson*, 249 F.3d 848, 859-60 (9th Cir.2001) (applying enhancement where the defendant created false logbooks to conceal driving violations in order to circumvent safety regulations)); *see also* Exhibit 5.

Accordingly, the correct guideline calculation is as follows:

Count One: Civil Disorder, 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. §2A2.4 | Base Offense Level | 10 |
| | Total | 10 |

Count Two: Destruction of Government Property, 18 U.S.C. 1361

| | | |
|---|---|---|
| U.S.S.G. §2B1.1 | Base Offense Level | 6 |
| U.S.S.G §2B1.1(b)(16)(A) | Conscious or Reckless Risk of Death or Serious Bodily Injury | 14 |
| | Total | 14 |

Grouping

| | | |
|---|---|---|
| U.S.S.G. § 3D1.2(a) | Each conviction its own unit | |
| U.S.S.G. § 3D1.4(a) | Total 2 units | |
| | Total | 16 |
| Acceptance of Responsibility | | -3 |
| | Total | 13 |

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 64. Accordingly, based on the government's calculation of the defendant's

total adjusted offense level, after acceptance of responsibility, at level 13, Jennings' Guidelines imprisonment range is 12 to 18 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II, Jennings' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Jennings played a unique and calculated role in the rioters' assault on the police officers in the Tunnel. He recognized that the Tunnel door prevented rioters from keeping up their fight, realized he had the means to easily remove that obstacle, then did so swiftly and efficiently. The nature and circumstances of Jennings' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 15 months of incarceration.

### B.  The History and Characteristics of the Defendant

Jennings served in the Army for three years. PSR ¶ 97. He then worked in two correctional facility healthcare roles for almost 30 years until his retirement in 2022. Jennings' military service and career as a corrections official makes his participation in a riot battling police particularly concerning. Jennings' role in catalyzing the Tunnel violence contradicts the oaths he took to defend the Constitution and the rule of law. It also makes his use of the glass-breaking end on a pair of emergency medial shears more aggravating—he took an implement used for medical purposes in his career as a healthcare worker and converted it into a tool for destruction.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Jennings' criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Jennings served in the military and worked for decades in the correctional system. Despite his experiences as a protector and healer, he chose the exact opposite path on January 6, 2021. This choice, combined with his contradictory and untruthful statements given to the FBI in this case, discounts the authority Jennings once wielded.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

And, as another presidential election looms with the January 6, 2025 certification proceeding following closely behind, Jennings' actions call for a sentence that addresses the accompanying specific deterrence concerns.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious,

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. St. Onge*, 23-cr-237 (CJN), the defendant pushed against other rioters who were surging against the police and barricades on the East Front. St. Onge then moved around the Capitol building to the West Plaza, where he made his way to the front of the crowd as rioters tore down barricades and fought police. After the police line on the West Plaza was breached, St. Onge followed the police up to the Inaugural Stage and into the Tunnel, where he entered and exited at least three separate times. He joined group push efforts against the police, handed up items to other rioters to use against the police, and assisted other rioters who had been sprayed with OC spray. Judge Nichols sentenced St. Onge to 18 months' incarceration.

Both Jennings and St. Onge directly contributed to pushing against officers, though St. Onge's acts in the Tunnel were facilitated by Jennings' property destruction. Both defendants also were not forthcoming during law enforcement interviews. The government is recommending a

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

lower sentence for Jennings because St. Onge committed his offense while under a criminal justice sentence and violated his pretrial release.

In *United States v. Lints*, 22-cr-259 (TNM), the defendant entered the Tunnel at approximately 3:11 p.m., engaged in a coordinated push against officers, and used a riot shield to prevent an officer from closing one of the Tunnel doors. Judge McFadden sentenced Lints to 4 months' incarceration and 4 months' home detention.

In *United States v. Reyher*, 23-cr-138 (RBW), the defendants—Arthur and Jessica Reyher—joined the violent mob in the Tunnel. They joined a collective push against the police and witnessed numerous officer assaults. This Court sentenced Arthur Reyher to eleven months of incarceration and Jessica Reyher to 90 days of incarceration. The Court gave Jessica Reyher a lesser sentence in light of the couples' four minor children.

Jennings' acts are more aggravating than those committed by Lints and the Reyhers, and those salient differences demonstrate the need for a more significant sentence of imprisonment in this case. For one, Lints and the Reyhers did not destroy Capitol property. Relatedly, their actions in the Tunnel were only possible because Jennings had already broken open the door separating rioters from the police. In other words, Jennings' actions facilitated the conduct for which *all* Tunnel defendants have been held to account. This aspect to Jennings' crime is unique to Jennings—no other rioter was the *first* to break open the Tunnel doors and open the floodgates to the mob.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jennings must pay $2,000 in restitution, which reflects in part the role Jennings played in the riot on January 6.[8] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Furthermore, the parties have agreed that Jennings will pay an additional $825 to the Architect of the Capitol for the damage to the glass door Jennings broke in the Tunnel. This amount represents

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the cost the Architect of the Capitol bore to repair the door. Jennings' $2,825 restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VIII.   FINE

Jennings' convictions for violations of 18 U.S.C. § 231(a)(3) and 1361 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. PSR ¶ 108.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 15 months of incarceration (the midpoint of the applicable guidelines range), 3 years of supervised release, $2,825 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     /s/ Nathaniel K. Whitesel
       NATHANIEL K. WHITESEL
       Assistant United States Attorney
       DC Bar No. 1601102
       601 D Street NW
       Washington, DC 20530
       nathaniel.whitesel@usdoj.gov
       (202) 252-7759